THE PEOPLE, &c., ON THE RELATION OF JAS. R. DEL VECCHIO, APPELLANT, *v.* THE BOARD OF SUPERVISORS OF KINGS COUNTY, RESPONDENTS.

*Mandamus—Appointment of County Papers by Boards of Supervisors.*

Persons publishing and printing the laws, as provided by chapter 280 of the Laws of 1845, are not entitled to compensation therefor unless they have been appointed, by the Supervisors of the county, printers to so publish and print the laws.

*P. S. Crooke* for Appellant.

*R. H. Huntley* for Respondents.

DAVIES, CH.J.—The Relator applied to the Supreme Court for a peremptory writ of mandamus, commanding the Respondents to audit and pay a bill of $139.50 for printing and advertising tax sales in said county. The return to the alternative writ states, that the Board of Supervisors of the County of Kings did not, on the first day of August, 1860, nor on any other day during said year, designate the Standard (a newspaper published in said county by the Relator), as one newspaper to publish and print the laws as provided by chap. 280 of Laws of 1845.

That said Board of Supervisors, at their annual meeting held on said first day of August, 1860, did appoint two printers to publish the laws of a local and general nature, in two newspapers published in said county of Kings, as provided by chap. 280 of the Laws of 1845, and that the two newspapers so appointed were designated by said Board, at said meeting, as the Brooklyn Daily Eagle and the Brooklyn Daily Times ; and that such appointment and designation were made as follows, to wit : That at said meeting of said Board of Supervisors a resolution was offered and adopted in these words : " Resolved, that the Board now proceed to ballot for a choice of the newspapers in which shall be published the laws affecting this county to be passed at

the next session of the Legislature." That upon the passage of said resolution the chairman of said Board appointed two Supervisors as tellers to receive the ballots which should be cast. That a balloting was then had, of which the tellers announced the result as follows, to wit:

That the number of ballots received was 24, of which 22 ballots contained each two names, one contained one name, and one was blank, and the vote was as follows, to wit:

| | |
|---|---|
| For the Brooklyn Daily Eagle | 16 votes. |
| For the Brooklyn Daily Times | 14 votes. |
| For the Brooklyn Evening Star | 12 votes. |
| For the Brooklyn City News | 2 votes. |
| For the Standard. | 1 vote. |
| For Blank | 1 vote. |

That the ballot containing a single name was for the Standard. That thereupon a member of said Board of Supervisors moved that the "Eagle" and "Times" be declared to be the two newspapers designated by said ballot to print and publish the laws affecting said county, which motion was adopted, no opposition thereto appearing on the minutes of said Board. That the mode above stated of designating two newspapers for publishing the laws had been before adopted and made use of by said Board, and that two newspapers were designated in the same manner the previous year, to wit, at the annual meeting of said Board, held on the 2d day of August, 1859; the Relator, James R. Del Vecchio, being then a Supervisor of said county, and present at said meeting, and participating and acting as teller in the designating and appointing of two newspapers for the aforesaid purpose, and in manner aforesaid. That in pursuance of the said designation and appointment, made on the first day of August, 1860, as aforesaid, the Comptroller of the State of New York, in or about the month of June, 1861, prepared for the county of Kings, and for publication in said papers, the Brooklyn Daily Eagle and the Brooklyn Daily Times, a notice of the sale of lands for taxes in Kings county, and caused such notice to be

published in said newspapers, as required by chapter 427 of the Laws of 1855, § 61, and that said newspapers did thereupon publish said notice for the time and in the manner required by said statute.  And that thereafter the proprietors of said newspapers did present their bills to said Board, duly verified; and said Board, at a regular meeting thereof, held on the sixth day of August, 1861, did audit and order the same to be paid, and the county treasurer of said county did, on the eighth and ninth days of August, 1861, pay to the publishers of said newspapers, "Eagle" and "Times," and to each of them, their respective bills of said publication, amounting to the sum of $139.50, each being for the same services for which payment is now claimed by the Relator. That the said Comptroller did not, nor did any person for him, prepare for publication, or request or cause to be published in the Standard, said notice or any notice of sale of lands for taxes, nor was the Relator, nor any of his agents or employés, requested or authorized to publish said notice; and that said notice was, without authority, copied into the Standard from the columns of the said "Eagle" and "Times," after the same had been published by them as before stated.

That the said Relator did not present his bill and claim for said advertising to said Board of Supervisors until after said bills of the "Eagle" and "Times" had been audited and paid as hereinbefore stated, to wit, not until the 19th day of August, 1861, although at the time said bills were presented, audited, and paid, he well knew the fact; nor did he, on the first day of August, 1861, or afterward, at any time object to the payment of said bills, nor claim that he had any demand against said Supervisors for said advertising until said 19th day of August, 1861; nor did he at any time previous to said last-mentioned day, claim or pretend that he was appointed printer, or that the Standard was designated or appointed by said Board of Supervisors as one of the newspapers to publish the laws as required by the statute hereinbefore referred to.

That for these reasons the Respondents had refused to audit said account of said Relator.

To this return the Relator demurred, thereby admitting all the facts therein stated.

Judgment was given for the Defendants upon the demurrer, and the Relator now appeals to this Court.

It is difficult to see upon what ground the Relator can claim compensation for the publication of the notice, issued by the Comptroller of the State, and by him directed to be published in two newspapers in the county of Kings, and which was so published. The Relator was never employed to publish said notice, and by his demurrer to the return, he admits that said notice was published by him without authority, and copied by him from the columns of the "Eagle" and the "Times," after the same had been published by those papers.

Section 61 of chapter 427 of Laws of 1855, makes it the duty of the Comptroller of the State to give notice of certain tax sales in the manner therein provided, "in the newspapers designated by the Board of Supervisors of such counties respectively to publish the session laws. . . . . . The Boards of Supervisors of the respective counties shall audit and pay the expenses of such publication."

The Relator admits that he was never authorized, or requested by the Comptroller of the State, to publish this notice.

This action, therefore, was merely voluntary, and created no legal liability upon the Board to audit and pay his bill. He was merely a volunteer.

Neither can the Relator claim the right to publish the notice in his paper, and to demand compensation therefor on the ground that he had been appointed one of the printers to print the laws under the Act of 1845.

That act directs the Boards of Supervisors of the several counties of this State, at their annual meetings, to appoint the printers for publishing the laws in their respective counties.

It then provides the manner of making the appointment. The Board of Supervisors of Kings county did proceed to make such appointment, and did appoint and designate two newspapers printed in said county to publish said laws. If there was any

irregularity in such appointment, or if the Relator was appointed as he claimed, he has not selected the proper mode for trying and settling those questions.

The appointment of the newspapers designated cannot be thus inquired into collaterally. The Relator, if he claimed to have been appointed or designated as one of the newspapers, should have instituted the proper proceeding to have tested that question. He should not have lain by and permitted others to enter upon the discharge of the duties of an office to which he claims to have been appointed, and thus subject the county to expense to such persons for the discharge of those duties. But it is very clear that the Relator, upon the facts stated in the return, never was appointed or designated as one of the printers within the meaning of the Act of 1845. It is apparent that the Supervisors did not observe the precise directions of the statute.

They did designate two newspapers to publish the laws, although not in the manner pointed out. This manner may be held directory as to form, if the substance of the Act was complied with. The balloting may be regarded as informal, but the resolution of the Board declared the result, and that could only be changed by a direct proceeding for that purpose.

Under no view of the facts can the Relator claim to have been appointed or designated as one of the papers.

It is to be borne in mind that the Board were to appoint two printers.

To attain this, each Supervisor was to vote for one, and the paper having the highest number of votes, and that having the next highest number of votes, " shall be the papers designated for printing the laws." It is thus seen that it was essential to an election that two papers were to be voted for at the same time. Two were to be chosen, appointed, or designated by the same act. Each Supervisor was restricted to voting for only one, and it may be conceded that all the ballots having more than one paper named thereon were void. It follows, therefore, that the only legal ballot cast was for the paper owned by the Relator. But one Supervisor alone voting could not make the appointment.

The Act clearly contemplates and requires that more than one vote shall be cast.

Two papers are to be appointed by one and the same process. No voter can vote for more than one paper. The paper having the highest number of votes, and the paper having the next highest number of votes, are to be the papers designated for printing the laws. It follows, therefore, at such an election, that at least three legal ballots must be cast, and that to make an appointment, one paper must have two, and another paper one. This is the least possible number of legal votes which can be voted, to make an appointment in compliance with the provisions of this Act.

Now, if the Relator's position be correct, there was but one legal vote cast at this election. If so, it conclusively follows that no appointment was made at that meeting of the Board, and it also clearly follows that the Relator, or his paper, was not appointed or designated. No one of two or more papers received the highest number of votes, and no paper received the next highest number of votes; consequently, no two papers could be designated for printing the laws.

In whatever aspect, therefore, we regard the Relator's claim for compensation for publishing the notice in question, we are unable to discover any legal ground for enforcing it.

Without discussing the question whether a mandamus was the proper remedy to compel payment of this demand, we are of the opinion that the judgment refusing to award it was correct, and should be affirmed with costs.

All concur.